**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| FAREEDAH MCNEILL, on behalf of her minor children, M.M. and K.M.; and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>BRAINPOP LLC,<br><br>Defendant. | Case No. ____________<br><br>COMPLAINT -- CLASS ACTION<br><br>JURY TRIAL DEMANDED |

# CLASS ACTION COMPLAINT

Plaintiff Fareedah McNeill, on behalf of her minor children M.M. and K.M. (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, alleges the following against Defendant BrainPOP LLC ("Defendant" or "BrainPOP") upon personal knowledge as to herself and her children, and upon information and belief—derived from, among other sources, the investigation of counsel and review of publicly available materials—as to all other matters:

## I. INTRODUCTION

1. Plaintiffs bring this class action to remedy BrainPOP's unlawful practice of routing its students' confidential personal information and academic activity to outside companies.

2. BrainPOP is an educational technology company that provides academic support for students as young as kindergarten age, in the form of short videos about educational topics.[1] BrainPOP sells subscription plans across several markets: supplemental products for individual families, plans for classroom teachers, enterprise licenses for schools and districts, and full-

[1] https://www.brainpop.com/discover (last visited Oct. 16, 2026).

curriculum offerings used for homeschooling and by cyber charter programs.[2] Students are assigned to watch specific videos by their school or teachers and access the videos through various websites owned and controlled by BrainPOP (the "BrainPOP Platform" or "Platform").[3]

3. But apart from providing access to assigned educational resources, BrainPOP also secretly records, collects, and transmits students' personally identifiable information ("PII")—tied to, *inter alia*, protected education records and to the specific instructional videos each student watches—to Unauthorized Third Parties[4] that were never authorized to receive it. These Unauthorized Third Parties include, at minimum, the online advertising technology companies Google LLC ("Google"), New Relic, Inc. ("New Relic"), and Mixpanel, Inc. ("Mixpanel").

4. BrainPOP built its Platform deliberately, and with knowledge of what it was doing, so that PII would be elicited from minor students in the ordinary course of their schoolwork—every time a child opens an assignment, and every time a child plays a video.

5. But this invasion of students' privacy occurred without the knowledge or consent of the victims or their parents or guardians. Students who logged in understood themselves to be interacting with BrainPOP and no one else. Nothing a child (or a parent looking over that child's

---

[2] https://www.brainpop.com/discover/plans (last visited Oct. 10, 2026).

[3] As discussed in further detail below, the product lines of the Platform are geared towards specific demographics: BrainPOP Jr. (grades K–3, roughly ages 5–9), *see* https://www.brainpop.com/classroom-solutions/products/brainpop-jr; BrainPOP (grades 3–8+, roughly ages 8–14), *see* https://www.brainpop.com/classroom-solutions/products/brainpop; BrainPOP Science (grades 6–8, roughly ages 11–14), *see* https://www.brainpop.com/classroom-solutions/products/brainpop-science; BrainPOP at Home (grades K–8, roughly ages 5–14), *see* https://www.brainpop.com/at-home; and BrainPOP ELL (for students learning English as a second language), *see* https://www.brainpop.com/classroom-solutions/products/brainpop-ell. (All websites last visited Oct. 10, 2026.)

[4] As used herein, an "Unauthorized Third Party" is any third party that either (1) was not contractually bound to use information intercepted and disclosed by BrainPOP solely as BrainPOP's agent and solely to advance BrainPOP's interests, or (2) used such information other than as BrainPOP's agent acting solely to advance BrainPOP's interests.

shoulder) could observe on the screen signaled that outside companies were simultaneously acquiring, recording, and retaining the substance of those sessions. Nor could they, since the technology used to acquire the students' PII is coded into the Platform, working invisibly in the background.

6. Specifically, BrainPOP embedded tracking code supplied by Google, New Relic, Mixpanel, and other Unauthorized Third Parties (together, the "Tracking Technologies") into its Platform.[5] That code captures and forwards the contents of student communications occurring inside password-protected space. By this means, BrainPOP handed students' PII, including but not limited to education records and video viewing histories, to companies with no right to them, in a manner contrary to federal and state law.

7. BrainPOP never told anyone it was doing this and never sought permission to feed identifiable student data to Unauthorized Third Parties in service of its own commercial growth.

8. The children whose PII BrainPOP gave away cannot lawfully consent to that transfer, and their parents were never asked. In many cases, including this one, a school or district, not the family, placed the child on the platform in the first place.

9. Congress has legislated repeatedly against this. The Family Educational Rights and Privacy Act ("FERPA"), 20 U.S.C. § 1232g, restricts the release of identifiable education records. The Children's Online Privacy Protection Act ("COPPA"), 15 U.S.C. § 6501 *et seq.*, conditions the collection of children's data online on verifiable parental consent. And the Video Privacy Protection Act ("VPPA"), 18 U.S.C. § 2710, forbids a provider of audiovisual materials from

[5] These include at least Google Tag Manager, Google Analytics, New Relic's instrumentation, and Mixpanel's instrumentation. BrainPOP deploys still other tracking tools on the pages that do not sit behind a student login. The complete inventory of tracking software BrainPOP has run on its Platform across the relevant period is information BrainPOP alone possesses; Plaintiffs therefore cannot name every such tool at this stage and expects discovery to supply the remainder.

revealing who watched what. Children using a state-funded curriculum are the paradigmatic beneficiaries of these protections.

10. New Jersey has gone even further. Its Student Online Privacy Protection Act, N.J.S.A. 56:8-215 to 56:8-221, bars an operator of an online education service from amassing student profiles for non-school purposes, from disclosing covered information to third parties that are not contractually confined to serving the operator, and from engaging in targeted advertising built on data gathered from schoolchildren. Every violation of that Act is, by force of N.J.S.A. 56:8-220, a *per se* unlawful practice under the New Jersey Consumer Fraud Act—which makes treble damages mandatory.

11. Plaintiffs accordingly assert, individually and for the Classes defined below, claims against BrainPOP for violation of the Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. § 2510 *et seq*.; violation of the VPPA, 18 U.S.C. § 2710, *et seq*.; violation of the New Jersey Student Online Privacy Protection Act, N.J.S.A. 56:8-215 to 56:8-221, and the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1, *et seq*.; violation of the New Jersey Wiretapping and Electronic Surveillance Control Act, N.J.S.A. 2A:156A-1 *et seq*.; intrusion upon seclusion; negligence and negligence *per se*; and unjust enrichment.

## II. PARTIES

### Plaintiff McNeill

12. Plaintiff Fareedah McNeill is an adult citizen of the State of New Jersey residing in Essex County. She brings this action on behalf of her minor children, M.M. and K.M.

### Minor Plaintiff M.M.

13. Minor Plaintiff M.M. is a minor, a child of Plaintiff McNeil, and a citizen of the State of New Jersey residing in Essex County.

14. M.M. is enrolled as a student in a school in the Livington School District, a public school operated by a school district established under Title 18A of the New Jersey Statutes. It is therefore a "K-12 school" within the meaning of N.J.S.A. 56:8-215.

15. M.M. used Defendant's Platform for K-12 school purposes—to complete assigned coursework and to watch the instructional videos at the center of their lessons—at the direction of their school and their teachers.

16. Neither M.M. nor their mother knew that, while M.M. was using Defendant's Platform, BrainPOP was simultaneously routing their identifiable personal data to third parties including at least Google, New Relic, and Mixpanel.

17. The material BrainPOP disclosed, and permitted third parties to acquire, included the record of which videos M.M. watched, the searches and queries they ran, their persistent identifiers, their status as a student in the Livingston School District, and more. Each category is "covered information" within N.J.S.A. 56:8-215.

18. As a minor, M.M. lacked and continues to lack the legal capacity to authorize BrainPOP to release any portion of their educational records, their video viewing history, or their private communications with BrainPOP. Their mother never authorized any such release.

19. M.M. was injured by BrainPOP's conduct, including through the invasion of their privacy in a manner a reasonable person would find highly offensive, the loss of control over valuable personal data at a formative age, and the loss of the benefit of the bargain.

**Minor Plaintiff K.M.**

20. Minor Plaintiff K.M. is a minor, a child of Plaintiff McNeil, and a citizen of the State of New Jersey residing in Essex County.

21. K.M. is enrolled as a student at a school in the Livingston School District, a public

school operated by a school district established under Title 18A of the New Jersey Statutes. It is therefore a "K-12 school" within the meaning of N.J.S.A. 56:8-215.

22. K.M. used Defendant's Platform for K-12 school purposes—to complete assigned coursework and to watch the instructional videos at the center of their lessons—at the direction of their school and their teachers.

23. Neither K.M. nor their mother knew that, while K.M. was using Defendant's Platform, BrainPOP was simultaneously routing their identifiable personal data to third parties including at least Google, New Relic, and Mixpanel.

24. The material BrainPOP disclosed, and permitted third parties to acquire, included the record of which videos K.M. watched, the searches and queries they ran, their persistent identifiers, their status as a student in the Livingston School District, and more. Each category is "covered information" within N.J.S.A. 56:8-215.

25. As a minor, K.M. lacked and continues to lack the legal capacity to authorize BrainPOP to release any portion of their education records, their video viewing history, or their private communications with BrainPOP. Their mother never authorized any such release.

26. K.M. was injured by BrainPOP's conduct, including through the invasion of their privacy in a manner a reasonable person would find highly offensive, the loss of control over valuable personal data at a formative age, and the loss of the benefit of the bargain.

**Defendant**

27. Defendant BrainPOP LLC is a Delaware limited liability company headquartered at 71 W 23rd St., 17th Fl., New York, NY 10010, in New York County. On information and belief, BrainPOP is wholly owned by Kirkbi A/S, a Danish entity. BrainPOP is therefore likely a citizen of some combination of Delaware, New York, and Denmark.

## III. JURISDICTION AND VENUE

28. Subject matter jurisdiction lies under 28 U.S.C. § 1331 because this Complaint pleads federal claims under the ECPA, 18 U.S.C. § 2510, *et seq.*, and the VPPA, 18 U.S.C. § 2710, *et seq*.

29. Subject matter jurisdiction lies independently under the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d): the amount in controversy exceeds $5,000,000 exclusive of interest and costs, the putative class exceeds 100 members, and minimal diversity is satisfied because Plaintiffs are New Jersey citizens, and numerous members of the proposed Nationwide Class are citizens of States other than New York, Delaware, and Denmark, of which BrainPOP is a citizen.

30. The Court has supplemental jurisdiction over the state-law claims under 28 U.S.C. § 1367(a) because every claim pleaded here arises from the same case or controversy.

31. The Court has general personal jurisdiction over BrainPOP because BrainPOP has made or established contacts in, and is registered to do business in the Commonwealth of Pennsylvania as a foreign entity and has thereby consented to the general personal jurisdiction of Pennsylvania's courts as to any cause of action, whether or not it arises from BrainPOP's activities in the Commonwealth. 42 Pa. C.S. § 5301(a), (b); *see Mallory v. Norfolk Southern Railway Co.*, 600 U.S. 122 (2023) (upholding Pennsylvania's consent-by-registration statute against a due process challenge).

32. Venue is proper under 28 U.S.C. § 1391(b)(1) and (c)(2) because BrainPOP is subject to personal jurisdiction in this District for venue purposes.

## IV. COMMON FACTUAL ALLEGATIONS

### A. THE BRAINPOP PLATFORM

33. BrainPOP, founded in 1999, is a privately held for-profit education company selling

online instruction to elementary and middle school students. Its method revolves around short, animated videos covering topics like math, science, social studies, etc. "Animated stories and activities for sparking curiosity and conversations".[6] The videos have a narrative format and feature the recurring characters Tim (a teenager), Moby (an orange robot), and Annie (the child protagonist of BrainPOP Jr. videos).

34. The BrainPOP Platform consists of multiple websites, each focusing on a specific demographic:[7]

a. BrainPOP –the primary website for BrainPOP, with instructional videos geared towards older children in grades 4-8;

b. BrainPOP Jr. – a site containing videos geared towards children in grades K-3;

c. BrainPOP Español – a site devoted to Spanish-language education;

d. BrainPOP Français – a site devoted to French-language education;

e. BrainPOP ELL – a site for non-native speakers learning English;

f. BrainPOP Educators – a site for teachers and parents;

g. GameUp – a library of educational games; and

h. My BrainPOP – a tool for students and teachers to record learning accomplishments.

35. Students engage with the BrainPOP Platform by going to their respective websites and logging on through BrainPOP's login portal.

---

[6] *See* footnote 1, supra.
[7] *See* footnote 3, supra.




Fig. 1[8]

36. Once logged on, the student is directed to her BrainPOP Dashboard, where she can see her assignment queue, play the movies that anchor her lessons, and work through related activities.




Fig. 2[9]

[8] https://www.brainpop.com/login/ (last visited Oct. 10, 2026).

[9] https://help.brainpop.com/hc/en-us/articles/360030786851-Student-Dashboard (last visited Oct. 10, 2026).

## B. THE BRAINPOP PLATFORM SURREPTITIOUSLY COLLECTS STUDENTS' PII WITHOUT THEIR KNOWLEDGE OR CONSENT

37. Plaintiffs and Class Members reasonably expect that any activity on BrainPOP would stay between the student and BrainPOP. However, without the knowledge or consent of any student or their guardian—and at all times relevant to this Action—the BrainPOP Platform contained and contains Tracking Technologies, defined below, that collect and expose students' PII and video viewing activity.

38. This is done for commercial purposes that are irrelevant to the educational purposes that students and their guardians are told that BrainPOP is meant to serve. As explained more fully below, BrainPOP and the third parties with whom it contracts exploit children's need for an education by monitoring, categorizing, and monetizing their private activity and their personal information.

### i. Overview of Relevant Online Tracking Technologies - Common Types of Data Points That Are Used to Create Data Profiles of Individuals Based on Their Online Activity

39. Companies that monitor our activity on websites, phones, tablets, smart TVs, and other Internet-enabled devices use a variety of technologies to track us. Most relevant to this Action, at present, are the technologies of "persistent identifiers" and "session replay tools," each of which are discussed in turn. Collectively, these are referred to as the "Tracking Technologies."

#### a. Persistent Identifiers

40. The most common data that websites, apps, and other online platforms acquire are called Persistent Identifiers. Persistent Identifiers are, at base, some piece of information (1) that points *only* to an individual or an individual's device, (2) that won't change, and (3) that can be accessed easily. Some Persistent Identifiers fit all three of these requirements, but trackers can still make use of an identifier that checks only one or two of these three boxes.

41. An identifier that checks all three boxes might be a name, an email, or a phone number. But it just as easily can be a "name" that the tracker itself gives you, like "af64a09c2" or "921972136.1561665654". Indeed, these types of alphanumeric strings are just as unique as a social security number, and can link one specific individual to all of the apps on her device and her activity on those apps, allowing her to be tracked over time and across devices (*e.g.*, smart phones, tablets, laptops, desktops and smart TVs). What matters most is that a given identifier points to a single individual and only that individual. Over time, companies can build a rich enough profile about the person known as "af64a09c2"—where they live, what they read, what they buy—that a conventional name is not necessary.

42. Additionally, an individual's phone, table, computer, or other internet-enabled device can be identified by its "Device Fingerprint" data, which is another form of persistent identifier. Device Fingerprint data include myriad individual pieces of data about a specific device, including details about its hardware—such as the device's brand (*e.g.*, Apple or Android) and the type of device (*e.g.*, iPhone, Galaxy, iPad)—and details about its software, such as its operation system (*e.g.*, iOS or Android). This data can also include more detailed information, such as the network carriers (*e.g.*, Sprint, T-Mobile, AT&T), whether it is connected to Wi-Fi, and the "name" of the device. The name of the device is often particularly personal, as the default device name is frequently configured to include users' first and/or last names (*e.g.*, "Jane Doe's iPhone"). In combination, the pieces of data comprising the Device Fingerprint provide a level of detail about the given device that allows that device and its user to be identified individually, uniquely, and persistently—as the appellation "Fingerprint" implies.

43. There are multiple, additional items of data that are universally recognized as Persistent Identifiers. For example, a device's Wi-Fi MAC address is a fixed serial number that is

used to identify one's phone when transmitting and receiving data using Wi-Fi.

**b. Session Replay Tools**

44. Session Replay tools are installed by website or app owners in order to record how individual users interact with their services. They log keystrokes, mouse movements, taps, swipes, and changes to the page, then allow first-party sites to "re-play" individual users' experiences after the fact, much like instant-replay footage one might see in a televised sports event.

45. Because every interaction is recorded, this technology captures sensitive Personal Data like medical information, credit card numbers, or passwords. The providers of session replay services usually leave it up to their clients to designate certain data as off-limits. But for clients, the process of filtering out sensitive information is subtle, painstaking, and time-consuming, and it clashes with replay services' promises to get set up "in a matter of seconds." As a result, independent auditing has found that sensitive PII typically ends up in the recordings, and that session replay service providers often fail to secure that data appropriately.

46. Session Replay is particularly egregious in the instant circumstance, in which individuals are having incredibly intimate information recorded—as if a stranger were watching over their shoulder—without consent and without any guarantee of who will see the information or how (or even *if*) the information will be secured.

**ii. BrainPOP Encodes Tracking Technologies From Third Parties to Unlawfully Acquire Users' PII.**

47. Forensic analysis of the BrainPOP Platform reveals that Defendant embeds or otherwise enables Tracking Technologies from at least three third parties: Google, New Relic, and Mixpanel, which results in the unlawful collection and transmission of students' PII as they use the Platform.

### a. Persistent Identifiers Shared With Google and Mixpanel

48. For example, the following image is of a data packet captured from network analysis when BrainPOP was accessed with Plaintiffs' children's accounts. The image shows BrainPOP providing a host of data points associated with the user, including the individual's (1) first name, (2) last name, (3) username associated with their BrainPOP account, and (4) school.


```
"user": {
    "EntryID": "[redacted]",
    "type": "student",
    "account_type": "school",
    "username": "[redacted]",
    "first_name": "[redacted]",
    "last_name": "[redacted]",
    "schools": [
        {
            "EntryID": "[redacted]",
            "name": "[redacted]",
            "display_name": "[redacted] Middle School",
            "country": "USA",
            "subscription_name": "BrainPOP (3-8) School Subscription",
            "subscription_access": [
```


Fig. 3[10]

49. In addition, BrainPOP creates its own, Persistent Identifier (here, called a "UUID" which is short for "universal user ID") for the child: bb8c757a-133a-46d3-8ec9-[ ]. The following is a different snippet from the same data packet, and contains the identifier at issue:

[10] Throughout the Complaint, where specific PII, including the UUID, is discussed, the PII is redacted either in whole or in part for privacy purposes.

```
"uuid": "bb8c757a-133a-46d3-8ec9-[redacted]",
"roles": [],
"login_mode": "normal",
"cmt_review": "true",
"is_orphan": false,
"school_info": {
    "EntryID": "[redacted]",
    "customer_id": "[redacted]",
    "institute_id": "[redacted]",
    "name": "[redacted]",
```


Fig. 4

50. This Persistent Identifier is then seen in traffic to Google, one of the world's largest data aggregators and an entity whose business model hinges on building behavioral profiles. Here, Google's profile data is keyed to the student by using the Persistent Identifier. The following shows the data in full as sent to Google in an HTTP POST request query parameter:


```
POST https://www.google-analytics.com/g/collect?v=2&tid=G-98DE2HWZRH&gtm=45je68q0v883731238za200zd883731238&_p=1787851355678&gcs=G101&gcd=13q3r3q3q5l1&npa=1&dma_cps=-&dma=0&
gdid=dMzY0Yz&_eu=AAAAAAQ&are=1&cid=1574407787.1787765738&frm=0&ngs=1&pscdl=denied&rcb=10&sr=1366x768&uaa=arm&uab=64&uafvl=Google%2520Chrome%3B137.0.7151.137%7CChromium%3B137.0.
7151.137%7CNot%252FA Brand%3B24.0.0.0&uam=&uamb=0&uap=Chrome%20OS&uapv=16267.66.0&uaw=0&ul=en&_s=3&
tag_exp=115938465~115938469~118897920~118897930~119367802~119367810~120213116~120385422~120476658&uid=bb8c757a-133a-46d3-8ec9-178[redacted]id=1787849332&sct=1&seg=1&
dl=https%3A%2F%2Fwww.brainpop.com%2F&dr=https%3A%2F%2Flaunchpad.classlink.com%2F&dt=BrainPOP&_tu=CA&en=bp_ga_event&_ee=1&ep.event_category=school&ep.
event_action=subject_bp_click&ep.event_label=Arts%20and%20Music&ep.product=bp&ep.custom_lan=en&ep.url=https%3A%2F%2Fwww.brainpop.com%2F&ep.user_type=student&_et=319&tfd=20617
HTTP/3.0
accept: */*
accept-encoding: gzip, deflate, br, zstd
```


Fig. 5

51. The following image shows the above Google request query parameters broken out in more readable format:

| | |
|---|---|
| uap | Chrome OS |
| uapv | 16267.66.0 |
| uaw | 0 |
| ul | en |
| _s | 3 |
| tag_exp | 115938465~115938469~118897920~118897930~119367802~119367810~120213116~120385422~120476658 |
| uid | bb8c757a-133a-46d3-8ec9- |
| sid | 1787849332 |
| sct | 1 |
| seg | 1 |
| dl | https://www.brainpop.com/ |
| dr | https://launchpad.classlink.com/ |
| dt | BrainPOP |
| _tu | CA |
| en | bp_ga_event |
| _ee | 1 |
| ep.event_category | school |
| ep.event_action | subject_bp_click |
| ep.event_label | Arts and Music |
| ep.product | bp |
| ep.custom_lan | en |
| ep.url | https://www.brainpop.com/ |
| ep.user_type | student |

Fig. 6

52. In addition to the Persistent Identifier received from BrainPOP, Google Analytics was observed to be using other Persistent Identifiers, namely "*cid*" and "*sid*"[11] along with a flag indicating the user is a student, as seen in the following figures.

| | |
|---|---|
| cid | 1574407787.1787765738 |

Fig. 7

[11] In Google's Ad Tech platform, "cid" refers to a "customer ID" or "client ID," and is a unique, Persistent Identifier. Similarly, "sid" refers to "session ID," representing an individual user's "session" on a website or app.

| | |
|---|---|
| uid | bb8c757a-133a-46d3-8ec9-. |
| sid | 1787849332 |
| sct | 1 |
| seg | 1 |
| dl | https://www.brainpop.com/ |
| dr | https://launchpad.classlink.com/ |
| dt | BrainPOP |
| _tu | CA |
| en | bp_ga_event |
| _ee | 1 |
| ep.event_action | page_load |
| ep.product | bp |
| ep.custom_lan | en |
| ep.url | https://www.brainpop.com/ |
| ep.user_type | student |
| tfd | 15033 |

Fig. 8

53. These same values for "*uid*," "*cid*," and "*sid*" are persistent throughout the session in all traffic to Google Analytics, with the "*cid*" value also appearing in the value for the "*_ga*" cookie set by Google Analytics.

| | |
|---|---|
| _ga | GA1.2.1574407787.1787765738 |

Fig. 9

54. A data packet being sent to Google with the combination of a Persistent Identifier, session identifier, and a student-specific flag allows Google to link every interaction recorded during the session, and attribute all of this current and future activity to a single, already-identified child, rather than anonymous data points. Because the *cid* value is also stored in the *_ga* cookie, Google can recognize the device and reconstruct this profile on future visits as well, extending the exposure beyond a single session.

55. Google also receives full-string URLs from the students' activity on the BrainPOP Platform. This data point identifies the specific webpage page being viewed and the page the

student accessed previously. This is concerning because Google is designed to capture the complete address of the page a user is on and the page they came from, including anything embedded in either address — such as security tokens or account identifiers. As seen below, these details were sent in addition to Google's "*cid*" identifier and the persistent UUIDv4 "*uid*" which was shared from BrainPOP.




Fig. 10

56. Much like Google, an additional third-party Advertising Technology ("Ad Tech") company called Mixpanel receives comparable PII, including but not limited to the above-described Persistent Identifier also dubbed a "UUID" by Defendant.[12] The below image shows the information received by Mixpanel in forensic testing:

---

[12] *See* paragraph 49, *supra*.

```
[
{
"$set":{
"$os":"Chrome OS",
"$browser":"Chrome",
"$browser_version":137,"
USER_ID":"bb8c757a-133a-46d3-8ec9-[redacted]",
"USER_TYPE":"student",
"ACCOUNT_TYPE":"school",
"PRODUCT_ORIGIN":"bp"},
"$token":"8f5f4955e739b86df49a9f19d76bfa24",
"$distinct_id":"bb8c757a-133a-46d3-8ec9-[redacted]
"$device_id":"d9999b6b-b7c7-4be7-b2ce-[redacted]",
"$user_id":"bb8c757a-133a-46d3-8ec9-[redacted]
}
]
```


Fig. 11

57. Here, Mixpanel also identifiers the UUID Persistent Identifier as a "$user_id" and "$distinct_id." Additional Persistent Identifiers exist in the above snippet of web traffic, including a "$device_id," which will uniquely identify the specific device through which the child is accessing BrainPOP.

**b. Session Replay Data Shared With Mixpanel**

58. Forensic testing of the BrainPOP and BrainPOP Jr. shows network traffic being directed to Mixpanel's session recording endpoint api-js.Mixpanel.com/record. This endpoint received parameters including *replay_id, replay_length_ms*, and *replay_start_url*, as well as the "UUID" Persistent Identifier described above. This session recording occurred on every page of the BrainPOP Platform visited during the testing, including pages showing specific videos.

59. The figure below is a snippet of traffic that shows, *inter alia*, the full URL of the page visited, along with query parameters:

```
POST https://api-js.mixpanel.com/record/?%24current_url=https%3A%2F%2Fjr.brainpop.com%2F&%24lib_version=2.82.0&
batch_start_time=1787851655.197&mp_lib=web&replay_id=65d42ae1-6e0c-469f-bfec-4f2fe7a0779a&replay_length_ms=2029&
replay_start_time=1787851655.197&replay_start_url=https%3A%2F%2Fjr.brainpop.com%2F&seq=0&
distinct_id=bb8c757a-133a-46d3-8ec9-[redacted]_id=65d[redacted]4device_id=2a488d29-43d9-4e35-9c0e-88e3f4304dae&
%24user_id=bb8c757a-133a-46d3-8ec9-[redacted]rl=ht[redacted]&format=gzip HTTP/2.0
accept: */*
accept-encoding: gzip, deflate, br, zstd
```

Fig. 12

60. The following figure shows same parameters in a more readable format:

| Key | Value |
|---|---|
| $current_url | https://jr.brainpop.com/ |
| $lib_version | 2.82.0 |
| batch_start_time | 1787851655.197 |
| mp_lib | web |
| replay_id | 65d42ae1-6e0c-469f-bfec-4f2fe7a0779a |
| replay_length_ms | 2029 |
| replay_start_time | 1787851655.197 |
| replay_start_url | https://jr.brainpop.com/ |
| seq | 0 |
| distinct_id | bb8c757a-133a-46d3-8ec9ec[redacted] |
| $device_id | 2a488d29-43d9-4e35-9c0e-[redacted] |
| $user_id | bb8c757a-133a-46d3-8ec9-[redacted] |
| format | gzip |

Fig. 13

### c. Session Replay (and Other) Data Shared With New Relic

61. Forensic analysis further reveals that Defendant shares Session Replay data, along with additional PII like Persistent Identifiers, with the Ad Tech company New Relic. New Relic was observed collecting click/event information related to when a child interacted with a video about hand washing on BrainPOP Jr.:




Fig. 14


```
        "pageUrl": "https://jr.brainpop.com/",
        "currentUrl": "https://jr.brainpop.com/topic/washing-hands/movie/",
        "eventType": "UserAction",
        "action": "click",
        "actionCount": 1,
        "actionDuration": 0,
        "actionMs": "[0]",
        "target":
"html>body>div#__nuxt>div#__layout>div>div>div>main#feature_main>div>div>div>div>div>div>div>div>button#pause:nth-
f-type(1)",
        "targetId": "play",
        "targetClass": "button-wrapper medium control_item",
        "targetTag": "BUTTON",
        "targetType": "submit",
        "nearestId": "pause",
        "nearestClass": "button-wrapper medium control_item",
        "nearestTag": "BUTTON",
        "nearestType": "submit"
    }
```


Fig. 15

### iii. The PII Collected by BrainPOP, via the Tracking Technologies, is Used to Unlawfully Profile the Children Who Use the BrainPOP Platform.

62. The above-described PII is collected for commercial—as opposed to educational—purposes. Companies like Google, Mixpanel, and New Relic value the PII of individuals—including children like M.M. and K.M.—because it can be used to observe an individual's

behavior over time and across the Internet in order to develop data profiles about that individual, in hopes of somehow manipulating them for a host of different commercial reasons.

63. Google, Mixpanel, and New Relic do not simply contract with BrainPOP, for example. Instead, their Tracking Technologies are embedded in thousands, if not millions, of other platforms. Accordingly, when they are able to uniquely identify a child user of BrainPOP through Persistent Identifiers and/or Session Replay tools, they may then check those items of PII against all other PII in their possession (including persistent identifiers and session replay tools), to see if that same person has had similar platforms provide similar PII. Over time, Ad Tech companies, like Google, Mixpanel, and New Relic, can confirm that an individual who uses BrainPOP *also* uses other platforms, and they may collect that observed behavior into a larger dossier of that individual's activity. This dossier, in turn, can be used to draw larger inferences about the person (here, a child), which in turn allows these companies, and the clients who pay them, to target and manipulate the individual, either for advertising purposes or for reasons even more nefarious.

**a. How PII Builds Data Profiles**

64. Data profiles—and the companies that create them—rely on accumulation. As articulated above, a persistent identifier is any value that stays associated with a particular person or device over time and across different apps, websites, and services. But it is this very type of data point that allows for accumulation of activity over time. What matters is not *which* identifier is used to monitor a person's activity, but that it persists, and that it travels with a person's activity wherever that activity is recorded.

65. And Persistent Identifiers are used to bind disparate data points about an individual, created a larger composite of who they are. Browsing history, app usage, purchases, and location data look mundane when considered one at a time. Combined, however, they create a revealing

picture of an individual.

### 1. How the profile is built

66. **Activity is tagged.** Each time a person uses a service, the activity (a search, a purchase, a video, a visit to a place) is recorded along with an identifier.

67. **Records are joined.** A collector that receives data from many services, whether through tracking code or by buying data, groups every record that carries the same identifier. Scattered fragments become one running history.




Fig. 16

68. **Links survive change.** Not all Ad Tech companies use the same Persistent Identifier, and personal identifiers might not last forever. They can be reset, deleted, or replaced. But collectors rarely rely on one. If one Persistent Identifier changes, but another identifier stays in place, the new activity can still be connected to an individual. Critically, when multiple Persistent Identifiers are being used (as is the case in this Action), resetting or deleting or obfuscating *one* identifier does not break the profile.




Fig. 17

69. **Data becomes inference.** As records accumulate over months and years, the profile reveals patterns. Browsing history, app usage, purchases, and location can be used to infer daily routines, likes or dislikes, political affiliation, religious belief, sexual identity, race and ethnicity, education, income, and physical and mental health, and to predict what may influence the person.




Fig. 18

70. **Scale and visibility** – In practice, many entities collect far more data than these diagrams show, across many devices, and buy and sell it among themselves. The person described by a profile generally cannot see which entities hold it, or how it is used. In its 2012 report entitled

"Mobile Apps for Kids: Disclosures Still Not Making the Grade," (the "FTC Mobile Apps for Kids Report") addressing privacy dangers in the app space, the FTC cited forensic analysis in which:

> [O]ne ad network received information from 31 different apps. Two of these apps transmitted geolocation to the ad network along with a device identifier, and the other 29 apps *transmitted other data (such as app name, device configuration details, and the time and duration of use) in conjunction with a device ID. The ad network could thus link the geolocation information obtained through the two apps to all the other data collected through the other 29 apps by matching the unique, persistent device ID.*[13]

71. The FTC Mobile Apps for Kids Report cautions that it is standard practice—and long has been standard practice—for Ad Tech companies (including, for example, Google, New Relic, and Mixpanel) to link the persistent identifiers they acquire with *additional* PII—such as name, address, email address—allowing those entities and their partners to identify individual users whom they profile with indisputable, individual specificity.[14]

72. A 2014 report by the Senate Committee on Homeland Security and Governmental Affairs entitled "Online Advertising and Hidden Hazards to Consumer Security and Data Privacy" amplifies this concern in light of the growth of third-party trackers that operate behind the scenes in routine online traffic:

> Although consumers are becoming increasingly vigilant about

[13] Federal Trade Commission, *Mobile Apps for Kids: Disclosures Still Not Making the Grade*, FTC Staff Report 2012, at 10 n. 25 (citing David Norris, Cracking the Cookie Conundrum with Device ID, AdMonsters (Feb. 14, 2012), (*see* http://www.admonsters.com/blog/crackingcookie-conundrum-device-id) ("Device ID technology is the ideal solution to the problem of remembering what a user has seen and what actions he or she has taken: over time, between devices and across domains. . . . *Device ID can also help businesses understand visitor behavior across devices belonging to the same person or the same residence.*") (emphasis added).

[14] *Mobile Apps for Kids: Disclosures Still Not Making the Grade*, *supra* at n.99, at10 n. 25 (citing Jennifer Valentino-DeVries, *Privacy Risk Found on Cellphone Games, Digits Blog*, Wall St. J., Sept. 19, 2011, *see* http://blogs.wsj.com/digits/2011/09/19/privacy-risk-found-oncellphone-games/ (noting how app developers and mobile ad networks often use device IDs to keep track of user accounts and store them along with more sensitive information like name, location, e-mail address or social-networking data)).

> safeguarding the information they share on the Internet, many are less informed about the plethora of information created about them by online companies as they travel the Internet. *A consumer may be aware, for example, that a search engine provider may use the search terms the consumer enters in order to select an advertisement targeted to his interests*. *Consumers are less aware, however, of the true scale of the data being collected about their online activity*. A visit to an online news site may trigger interactions with hundreds of other parties that may be collecting information on the consumer as he travels the web. The Subcommittee found, *for example, a trip to a popular tabloid news website triggered a user interaction with some 352 other web servers as well.…The sheer volume of such activity makes it difficult for even the most vigilant consumer to control the data being collected or protect against its malicious use.*[15]

73. The ability to serve targeted advertisements to (or to otherwise profile) a specific user no longer turns upon obtaining the kinds of data with which most consumers are familiar (name, email addresses, etc.), but instead on the surreptitious collection of Persistent Identifiers, which are used in conjunction with other data points to build robust online profiles. These Persistent Identifiers are better tracking tools than traditional identifiers because they are unique to each individual, making them more akin to a social security number.

74. And, once a Persistent Identifier is sent into the marketplace, it is exposed and thereafter it may be collected and used by an almost innumerable (and certainly unknowable) set of third-parties. Upon acquiring PII from children using BrainPOP, including Plaintiffs, companies like Google, Mixpanel, and New Relic do not simply keep the data to themselves. Rather, they use it to create new, remunerative relationships with *additional* entities seeking to exploit the PII and to manipulate the children who use BrainPOP.

[15] "Online Advertising and Hidden Hazards to Consumer Security and Data Privacy: Majority and Minority Staff Report", U.S. Senate Permanent Subcommittee on Investigations, Committee on Homeland Security and Governmental Affairs Committee, May 15, 2014, at 1 (emphasis added), see https://www.hsdl.org/document/753204.

## C. BRAINPOP DID NOT OBTAIN CONSENT TO COLLECT AND TRANSMIT CHILDREN'S PII

75. Plaintiffs and Class Members had no means of learning that BrainPOP was collecting and disclosing their PII, because the Tracking Technologies ran silently in the background of the BrainPOP Platform, coded into BrainPOP's websites, but never being revealed or even discovered.

76. Even more egregious, BrainPOP represents to users that it will "solely use the Student Records for the purpose of providing and enhancing teacher and student use of the Services."[16]

77. A student or parent reading that language would understand the student's PII to be confidential. Feeding protected education-related PII and video viewing histories to advertising and analytics companies, as described above, breaks that promise.

78. Given those representations and the intrinsically sensitive character of the information, BrainPOP students and their families reasonably believed their PII would not be handed to or exploited by third parties.

## D. PLAINTIFFS AND CLASS MEMBERS HAD A REASONABLE EXPECTATION OF PRIVACY

79. Invasion of privacy has been recognized as a common law tort for over a century. *See Matera v. Google Inc.*, 15-CV-0402, 2016 WL 5339806, at *10 (N.D. Cal, Sept. 23, 2016) (citing Restatement (Second) of Torts §§ 652A-I for the proposition that "the right to privacy was first accepted by an American court in 1905, and 'a right to privacy is now recognized in the great majority of the American jurisdictions that have considered the question'"). *Id.* As Justice Brandeis explained in his seminal article, *The Right to Privacy*, "[t]he common law secures to each individual

---

[16] https://www.brainpop.com/discover/terms-of-use (last visited Oct. 16, 2026).

the right of determining, ordinarily, to what extent his thoughts, sentiments, and emotions shall be communicated to others." Samuel D. Warren & Louis Brandeis, *The Right to Privacy*, 4 HARV. L. REV. 193, 198 (1890). The Second Restatement of Torts recognizes the same privacy rights through its tort of intrusion upon seclusion, explaining that "[o]ne who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy." Restatement (Second) of Torts § 652B (1977). The Supreme Court similarly recognized the primacy of privacy rights, explaining that the Constitution operates in the shadow of a "right to privacy older than the Bill of Rights." *Griswold v. Connecticut*, 381 U.S. 479, 486 (1965).

80. The Supreme Court explicitly recognized the reasonable expectation of privacy an individual has in her cell phone, and the Personal Information generated therefrom, in its opinion in *Carpenter v. United States*, 138 S. Ct. 2206 (2018). There, the Court held that continued access of an individual's cell phone location data constituted a search under the Fourth Amendment because "a cell phone—almost a "feature of human anatomy[]"—tracks nearly exactly the movements of its owner.…A cell phone faithfully follows its owner beyond public thoroughfares and into private residences, doctor's offices, political headquarters, and other potentially revealing locales.…Accordingly, when the Government tracks the location of a cell phone it achieves near perfect surveillance, as if it had attached an ankle monitor to the phone's user." *Id.* at 2218 (internal citations omitted).

81. It is precisely because of our devices' capacity for "near perfect surveillance" that courts have consistently held that time-honored legal principles recognizing a right to privacy in one's affairs naturally apply to online monitoring.

### i. Expectations of Privacy Contemplated in This Action Are Found in Numerous Statutes

82. At both the federal and state level, legislatures repeatedly enacted statutes meant to combat the privacy harms addressed in this Action.

#### a. Privacy Rights at the Federal Level – the Children's Online Privacy Protection Act.

83. Beyond the common law, legislatures have enacted stringent privacy protections, for children, in the digital space. The paradigmatic example of this is the federal Children's Online Privacy Protection Act ("COPPA"), 15 U.S.C. §§6501, *et seq*., a statutory scheme expressly enacted to "place parents in control over what information is collected from their young children online."[17]

84. COPPA "prohibits unfair or deceptive acts or practices in connection with the collection, use, and/or disclosure of personal information from and about children on the Internet." 16 C.F.R. § 312.1. Specifically, it is "unlawful for an operator of a website or online service directed to children, or any operator that has actual knowledge that it is collecting personal information from a child, to collect personal information from a child in a manner that violates the [relevant] regulations" prescribed by the FTC. 15 U.S.C. § 6502(a)(1). COPPA provides that the operator must "obtain verifiable parental consent prior to any collection, use, and/or disclosure of personal information from children." 16 C.F.R. §§ 312.3(b), 312.4(a).

85. Thus, under COPPA, developers of child-directed apps and websites—and any third parties working on the developers' behalf—are prohibited from traditional practices endemic to the online ecosystem unless they first alert parents to the fact that data will be generated, collected, and shared; and second, obtain the verifiable consent of the parent to do so. 16 C.F.R. §§

[17] *See* General Questions about the COPPA, FAQ 1, https://www.ftc.gov/tips-advice/business-center/guidance/complying-coppa-frequently-asked-questions-0#A.%20General%20Questions (last visited Oct. 15, 2026).

312.4, 312.5.

86. Such verifiable consent must be informed and meaningful—COPPA requires operators (even educational technology companies like Defendant) to offer something more than checking a box in a "clickwrap" agreement[18] or posting an inconspicuous hyperlink to a privacy policy that a user may or may not peruse. Instead, there must be a strong, objective record of a parent's consent to her child being tracked.

87. Under COPPA, operators whose content is directed to children are strictly liable if personal information is collected, used, and/or disclosed from children under 13. 16 C.F.R. § 312.2. Operators are also strictly liable if personal information is collected or maintained on their behalf, which COPPA defines as when "[t]he operator benefits by allowing another person to collect personal information directly from users of" an online service. *Id.*

88. COPPA defines "personal information" broadly as follows:

> individually identifiable information about an individual collected online, including (1) A first and last name; (2) A home or other physical address including street name and name of a city or town; (3) Online contact information as defined in this section; (4) A screen name or user name…; (5) A telephone number; (6) A government-issued identifier, such as a Social Security, State identification card, birth certificate, or passport number; (7) A persistent identifier that can be used to recognize a user over time and across different websites or online services. Such persistent identifier includes, but is not limited to, a customer number held in a cookie, an Internet Protocol (IP) address, a processor or device serial number, or unique device identifier"); (8) A photograph, video, or audio file where such file contains a child's image or voice; (9) Geolocation information sufficient to identify street name and name of a city or town; (10) A biometric identifier that can be used for the automated or semi-automated recognition of an individual, such as fingerprints; handprints; retina patterns; iris patterns; genetic data, including a DNA sequence; voiceprints; gait patterns; facial

[18] Clickwrap agreements require a user to affirmatively click a box on a website acknowledging agreement to the terms of service before the user is allowed to proceed.

> templates; or faceprints; or (11) Information concerning the child or the parents of that child that the operator collects online from the child and combines with an identifier described in this definition.

16 C.F.R. § 312.2. Similarly, "online contact information" is defined as "an email address or any other substantially similar identifier that permits direct contact with a person online, including but not limited to, an instant messaging user identifier, a voice over internet protocol (VOIP) identifier, a video chat user identifier, or a mobile telephone number…." *Id.*

89. To collect, use, or disclose personal information lawfully (including screen names that can be used to contact a child), COPPA requires that an operator meet specific requirements, including each of the following:

**<u>Direct Notice to Parents or Guardians</u>**

90. It is not enough that an operator simply has a free-standing privacy policy or terms of service on a website or in an app. COPPA requires an operator to use "reasonable efforts" to provide direct notice to parents prior to obtaining or disclosing a child's personal information. Specifically, "[a]n operator must make reasonable efforts, taking into account available technology, to ensure that a parent of a child receives direct notice of the operator's practices with regard to the collection, use, or disclosure of personal information from children, including notice of any material change in the collection, use, or disclosure practices to which the parent has previously consented." 16 C.F.R. § 312.4(b). This notice must contain the following information:

> (i) …that the operator has collected the parent's online contact information from the child, and, if such is the case, the name of the child or the parent, in order to obtain the parent's consent;
>
> (ii) That the parent's consent is required for the collection, use, or disclosure of such information, and that the operator will not collect, use, or disclose any personal information from the child if the parent does not provide such consent;
>
> (iii) The items of personal information the operator intends to collect

> from the child, how the operator intends to use such information, and the potential opportunities for the disclosure of personal information, should the parent provide consent;
>
> (iv) Where the operator discloses personal information to one or more third parties, the identities or specific categories of such third parties (including the public if making it publicly available) and the purposes for such disclosure, should the parent provide consent, and that the parent can consent to the collection and use of the child's personal information without consenting to the disclosure of such personal information to third parties except to the extent such disclosure is integral to the website or online service;
>
> (v) A hyperlink to the operator’s online notice of its information practices…;
>
> (vi) The means by which the parent can provide verifiable consent to the collection, use, and disclosure of the information; and
>
> (vii) If the operator has collected the name or online contact information of the parent or child to provide notice and obtain parental consent, that if the parent does not provide consent within a reasonable time from the date the direct notice was sent, the operator will delete the parent’s online contact information and the parent’s or child’s name from its records.

16 C.F.R. § 312.4(c)(1).

**<u>Online Notice</u>**

91. “In addition to the direct notice to the parent, an operator must post a prominent and clearly labeled link to an online notice of its information practices with regard to children….To be complete, the online notice of the Web site or online service’s information practices must state the following:

> (1) The name, address, telephone number, and email address of all operators collecting or maintaining personal information from children through the Web site or online service. Provided that: The operators of a Web site or online service may list the name, address, phone number, and email address of one operator who will respond to all inquiries from parents concerning the operators’ privacy policies and use of children’s information, as long as the names of all the operators collecting or maintaining personal information from children through the Web site or online service are also listed in the notice;

> (2) A description of what information the operator collects from children, including whether the Web site or online service enables a child to make personal information publicly available; how the operator uses such information; and the operator's disclosure practices for such information; and
>
> (3) That the parent can review or have deleted the child's personal information and refuse to permit further collection or use of the child's information and state the procedures for doing so.

16 C.F.R. § 312.4(d).

**Verifiable Parental Consent**

92. Broadly, "[a]n operator is required to obtain verifiable parental consent before any collection, use, or disclosure of personal information from children, including consent to any material change in the collection, use, or disclosure practices to which the parent has previously consented." 16 C.F.R. § 312.5(a)(1).

93. But this consent may not be presented as an all-or-nothing proposition. Instead, "[a]n operator must give the parent the option to consent to the collection and use of the child's personal information without consenting to disclosure of his or her personal information to third parties… ." 16 C.F.R. § 312.5(a)(2).

94. "An operator must make reasonable efforts to obtain verifiable parental consent, taking into consideration available technology. Any method to obtain verifiable parental consent must be reasonably calculated, in light of available technology, to ensure that the person providing consent is the child's parent." 16 C.F.R. § 312.5(b)(1).

95. The FTC has identified the following methods as acceptable ways to obtain verifiable parental consent: (i) providing a consent form for parents to sign and return; (ii) requiring the use of a credit card/online payment that provides notification of each transaction; (iii) connecting to trained personnel via video conference; (iv) calling a staffed toll-free number; (v) providing a copy of a form of government issued ID that you check against a database (to be deleted upon verification); (vi) asking knowledge-based questions; or (vii) verifying a photo ID from the parent compared to a second photo using facial recognition technology. 16 C.F.R. §

312.5(b)(2).[19]

**b. Privacy Rights at the Federal Level – the Family Educational Rights and Privacy Act.**

96. FERPA, 20 U.S.C. § 1232g *et seq*., and its implementing regulations at 34 C.F.R. Part 99 govern access to and release of "education records."

97. FERPA defines "education records" as "those records, files, documents, and other materials which—(i) contain information directly related to a student; and (ii) are maintained by an educational agency or institution or by a person acting for such agency or institution." 20 U.S.C. § 1232g(a)(4)(A).

98. A "student" is "any person with respect to whom an educational agency or institution maintains education records or personally identifiable information, but does not include a person who has not been in attendance at such agency or institution." 20 U.S.C. § 1232g(a)(6).

99. The Department of Education explains that education records "include but are not limited to grades, transcripts, class lists, student course schedules, health records (at the K-12 level), student financial information (at the postsecondary level), and student discipline files."

100. Under FERPA's regulations, "personally identifiable information" includes but is not limited to: the student's name; the name of a parent or other family member; the address of the student or her family; a personal identifier such as a Social Security number, student number, or biometric record; indirect identifiers such as date of birth, place of birth, and mother's maiden name; other information that alone or in combination is linked or linkable to a specific student such that a reasonable person in the school community lacking personal knowledge could identify

---

[19] *See also* "*Children's Online Privacy Protection Rule: A Six-Step Compliance Plan for Your Business*," Federal Trade Commission, https://www.ftc.gov/tips-advice/business-center/guidance/childrens-online-privacy-protection-rule-six-step-compliance (last visited Oct. 15, 2026).

the student with reasonable certainty; and information requested by a person the institution reasonably believes knows the student's identity. 34 C.F.R. § 99.3.

101. FERPA bars an educational agency or institution from disclosing personally identifiable information drawn from education records absent signed and dated written consent, subject to exceptions inapplicable here. See 34 C.F.R. §§ 99.30–31.

102. Plaintiffs and Student Subclass Members—who used or use BrainPOP as a component of their publicly funded education—are students within FERPA's meaning. *See* 20 U.S.C. § 1232g(a)(6).

103. What the Tracking Technologies carried out included students' status as students, their assignment lists, their completion of assignments, and their assigned-video viewing histories. These are education records subject to FERPA.

104. By disclosing education records paired with unique identifiers such as Google's "cid," without consent, BrainPOP acted contrary to FERPA. Plaintiffs plead these facts to establish the standard of care, the reasonableness of Plaintiffs' privacy expectations, and the tortious and unlawful character of BrainPOP's conduct; Plaintiffs do not assert a private right of action under FERPA.

**c. Privacy Rights at the State Level – New Jersey's Student Online Privacy Protection Act**

105. New Jersey enacted P.L. 2019, c. 494, codified at N.J.S.A. 56:8-215 to 56:8-221, to regulate operators of online education services used in its public schools. The statute was written for services exactly like BrainPOP, and it prohibits precisely what BrainPOP did.

106. An "online education service" is "an Internet website, online service, online computer application, or mobile application that is used primarily for K-12 school purposes and is designed and marketed for K-12 school purposes." N.J.S.A. 56:8-215. An "operator" is the operator

of such a service "with actual knowledge that the online education service is used primarily for K-12 school purposes and is designed and marketed for K-12 school purposes." *Id.*

107. BrainPOP is an operator of an online education service. Defendant's Platform is used primarily for K-12 school purposes and is designed and marketed for K-12 school purposes—BrainPOP organizes its entire product line by grade band, sells enterprise licenses to schools and districts, supplies teacher dashboards and assignment tools, and advertises itself as "the name millions of educators trust." BrainPOP's knowledge of these facts is actual and complete.

108. "Covered information" under the statute is broad. It includes personally identifiable information created by or provided to an operator by a student in the course of using the service for K-12 school purposes, and information "gathered by an operator through the operation of its site, service, or application for K-12 school purposes" that personally identifies a student—expressly including "persistent unique identifiers," "search activity," "student identifiers," "geolocation data," "electronic mail address," and information in the student's education record. N.J.S.A. 56:8-215.

109. Every category of data BrainPOP disclosed is covered information. The Google "cid" and the New Relic and BrainPOP user identifiers are persistent unique identifiers. The queries students ran are search activity. The school-issued login credentials are electronic mail addresses. The assignment lists, completion records, and video viewing histories are information from the student's education record.

110. N.J.S.A. 56:8-216(a)(1) prohibits an operator from knowingly using covered information "to amass a profile about a student for any purpose other than K-12 school purposes." BrainPOP did exactly that, and worse: it enabled Unauthorized Third Parties to amass such profiles in their own systems, for their own commercial purposes.

111. N.J.S.A. 56:8-216(a)(3) prohibits an operator from knowingly disclosing covered information except in enumerated circumstances. The only arguably relevant exception, subsection (f), permits disclosure to a third party solely where the operator "contractually prohibits the third party from using any covered information for any purpose other than providing the contracted service to or on behalf of the operator, prohibits the third party from disclosing any covered information provided by the operator with subsequent third parties, and requires the third party to implement and maintain reasonable security procedures and practices."

112. Google, New Relic, Mixpanel, and any other Unauthorized Third Parties on the BrainPOP Platform operate under no such restrictions. As alleged above, they use the data they receive for their own purposes—Google to enrich its advertising profiles and train its models, New Relic for research and development, marketing, targeted advertising, and to "link or combine information about you with other Personal Data"[20] and Mixpanel to '[k]now exactly what user behavior is trying to tell you."[21] None are contractually confined to providing a contracted service on BrainPOP's behalf. The subsection (f) exception is therefore unavailable, and no other exception applies.

113. N.J.S.A. 56:8-216(a)(4) prohibits an operator from knowingly engaging in targeted advertising on its own service, or targeting advertising anywhere else, where the targeting is "based on any information, including covered information, that the operator's service has acquired because of the use of the operator's service for K-12 school purposes." BrainPOP transmitted covered information to Google precisely so that it could reach students, their parents, and demographically similar prospects with advertising. "Targeted advertising" is defined to include advertising selected

[20] https://newrelic.com/termsandconditions/privacy/14mar2021 (last visited Oct. 16, 2026).
[21] https://mixpanel.com/home/ (last visited Oct. 16, 2026).

"based on information obtained or inferred over time from that student's online behavior." N.J.S.A. 56:8-215.

114. N.J.S.A. 56:8-217 separately requires an operator to "implement and maintain reasonable security procedures and practices appropriate to the nature of the covered information" and to "protect that information from unauthorized access, destruction, use, modification, or disclosure." BrainPOP did neither; it configured its systems to transmit covered information outward by design.

115. Critically, N.J.S.A. 56:8-220 provides: "It shall be an unlawful practice pursuant to P.L.1960, c.39 (C.56:8-1 *et seq*.) for an operator of an online education service to violate the provisions of P.L.2019, c.494 (C.56:8-215 *et seq*.), or any rule or regulation adopted pursuant thereto." Each violation described above is therefore a *per se* unlawful practice under the New Jersey Consumer Fraud Act, carrying that Act's remedies—including the treble damages that N.J.S.A. 56:8-19 makes mandatory.

**d. The Public's Consistent Articulation of Their Expectation of Privacy**

116. When Plaintiffs and Class Members logged in and used the BrainPOP Platform, they expected that what they did there would remain between them and BrainPOP. Nothing about a school-assigned learning tool suggested otherwise.

117. That expectation is widely shared. In 2023, the Pew Research Center found that 73 percent of Americans feel they have little or no control over what companies do with their data, and 67 percent say they understand little or nothing about what companies are doing with it.[22] Concern

[22] Colleen McClain, Michelle Faverio, Monica Anderson & Eugenie Park, *How Americans View Data Privacy*, PEW RESEARCH CENTER (Oct. 18, 2023), https://www.pewresearch.org/internet/2023/10/18/how-americans-view-data-privacy/ (last visited Oct. 15, 2026).

runs highest where children are involved: 89 percent of Americans are very or somewhat concerned about social media platforms knowing personal information about kids.[23] In a 2022 national survey of parents, 73 percent were concerned about personal data being collected by third parties without their consent, 85 percent said protecting their children's school records was important, and 84 percent said the same of their children's browsing history.[24]

118. When people are actually given the choice, they refuse to be tracked. After Apple began requiring apps to ask permission before tracking users across other companies' apps and websites, only about 4 percent of daily U.S. users opted in.[25]

119. Federal regulators have recognized that students and families should not have to trade privacy for schooling. In announcing its 2022 policy statement on education technology, the Federal Trade Commission warned against edtech practices that "force parents and schools to surrender their children's privacy rights in order to do schoolwork online," and the Director of its Bureau of Consumer Protection added that "[p]arents should not have to choose between their children's privacy and their participation in the digital classroom."[26]

120. Yet the practice is widespread and largely hidden. A 2022 Human Rights Watch investigation of 164 education technology products found that most "sent or granted access to children's data to advertising technology (AdTech) companies," and that "[c]hildren, parents, and

---

[23] *Id.*

[24] *Polling Memo: Parents' Views on Children's Digital Privacy and Safety*, TRUSTED FUTURE (July 15, 2022), https://trustedfuture.org/childrens-digital-privacy-and-safety/ (last visited Oct. 15, 2026) (national survey of 992 parents of children 17 or younger).

[25] *Only 4% of iOS users in US are opting in to ad tracking, report says*, APPLEINSIDER (May 6, 2021), https://appleinsider.com/articles/21/05/07/only-4-of-ios-users-in-us-are-opting-in-to-ad-tracking-report-says (last visited Oct. 15, 2026) (reporting Flurry Analytics data).

[26] Press Release, Fed. Trade Comm'n, FTC to Crack Down on Companies that Illegally Surveil Children Learning Online (May 19, 2022), https://www.ftc.gov/news-events/news/press-releases/2022/05/ftc-crack-down-companies-illegally-surveil-children-learning-online (last visited Oct. 15, 2026).

teachers were largely kept in the dark about these data surveillance practices."[27]

## E. THE DISCLOSED DATA HAS MEASURABLE VALUE AND BRAINPOP WAS UNJUSTLY ENRICHED

121. Conservative estimates put internet companies' 2018 earnings from personal data at roughly $202 per American user.[28] Estimates for 2022 reach $434 per user, or more than $200 billion across the industry.[29]

122. Companies have paid cash for this same category of information. Until 2019, Meta (then Facebook) operated a "Facebook Research" program that paid participants as young as 13 up to $20 per month, plus referral fees, for access to their internet browsing activity and private communications.[30]

123. Education-related data is worth more than most. Educational institutions pay roughly $200 per lead to attract a prospective student.[31] Data on such leads is correspondingly valuable to Google, which uses it both to attract advertisers and to enrich its profiles of individuals. What BrainPOP disclosed made Google's holdings more detailed and more valuable still, because it concerns children during their formative years.[32]

---

[27] Press Release, Human Rights Watch, Governments Harm Children's Rights in Online Learning (May 25, 2022), https://www.hrw.org/news/2022/05/25/governments-harm-childrens-rights-online-learning (last visited Oct. 15, 2026).
[28] Robert J. Shapiro, *What Your Data Is Really Worth to Facebook*, WASHINGTON MONTHLY (July 12, 2019), https://washingtonmonthly.com/2019/07/12/what-your-data-is-really-worth-to-facebook/ (last visited Oct. 15, 2026).
[29] *Id.*
[30] Josh Constine, *Facebook pays teens to install VPN that spies on them*, TECHCRUNCH (Jan. 29, 2019), https://techcrunch.com/2019/01/29/facebook-project-atlas/ (last visited Oct. 15, 2026).
[31] *See, e.g.,* Patrick Van Gorder, *Higher education lead generation in 2025: Reimagining pay-per-lead strategies*, LEVEL, https://www.level.agency/perspectives/higher-education-lead-generation-ppl-strategies (last visited Oct. 15, 2026).
[32] *See, e.g.,* Press Release, Fed. Trade Comm'n, Google and YouTube Will Pay Record $170 Million for Alleged Violations of Children's Privacy Law (Sept. 4, 2019), https://www.ftc.gov/news-events/news/press-releases/2019/09/google-youtube-will-pay-record-170-million-alleged-violations-childrens-privacy-law (last visited Oct. 15, 2026).

124. The market price of that attention keeps rising. Working from Facebook's own financial statements, *The Washington Post* calculated that the average American's data generated about $19 a year in Facebook advertising sales in 2013, and $164 a year by 2020.[33]

125. Advertising platforms offer purpose-built targeting parameters keyed to the institution a person attended, her highest level of education, and her field of study—all categories of information BrainPOP supplied to Google.[34] That the targeting products exist confirms that the PII and education data BrainPOP disclosed carries objective market value.

126. Multiple companies pay consumers for a license to track this same information. Nielsen, UpVoice, HoneyGain, and SavvyConnect, along with Google itself, all compensate individuals for browsing-history data.

127. The unauthorized disclosure of Plaintiffs' and Class Members' private data through the Tracking Technologies has diminished the value of that data, injuring them.

128. Had Plaintiffs or Class Members known BrainPOP was disclosing their private information to third parties and exploiting it, they would have expected BrainPOP to be paid less for its services, or would have expected compensation for the value of the data itself. Students receiving BrainPOP as part of a public school curriculum would not have expected to surrender their privacy as the price of the education the State guarantees them.

129. BrainPOP, meanwhile, took in benefits it had no right to: targeted advertising and marketing on third-party platforms; sophisticated analytics it would not otherwise have obtained;

---

[33] Geoffrey A. Fowler, "*There's no escape from Facebook, even if you don't use it*," THE WASHINGTON POST (Aug. 29, 2021), https://www.washingtonpost.com/technology/2021/08/29/facebook-privacy-monopoly/ (last visited Oct. 15, 2025).

[34] *Advanced Targeting*, META, https://developers.facebook.com/docs/marketing-api/audiences/reference/advanced-targeting/ (last visited Oct. 15, 2026).

and the valuable data itself.

## V. TOLLING AND ESTOPPEL

130. Any applicable limitations period has been tolled by BrainPOP's knowing and active concealment of the Tracking Technologies it installed on its Platform.

131. Those Tracking Technologies were, and remain, invisible to visitors of the BrainPOP Platform.

132. Plaintiffs and Class Members were misled and could not reasonably have uncovered BrainPOP's conduct, through no fault or want of diligence on their part.

133. Plaintiffs lacked the information necessary to pursue these claims, again through no fault or want of diligence.

134. BrainPOP alone knew that its Platform contained Tracking Technologies, and it never told its students—Plaintiffs and Class Members among them—that using its Platform would expose their sensitive information to Unauthorized Third Parties.

135. In these circumstances BrainPOP was under a duty to disclose the nature, significance, and consequences of how it collected and handled student information. To this day BrainPOP has not admitted, acknowledged, or otherwise signaled to its users or their families that it released their PII to Unauthorized Third Parties.

136. All applicable limitations periods are likewise tolled under the discovery rule.

137. The earliest date on which Plaintiffs or Class Members, exercising due diligence, could reasonably have discovered BrainPOP's conduct was shortly before this Complaint was filed.

## VI. CLASS ACTION ALLEGATIONS

138. Plaintiffs bring this action on their own behalf, and on behalf of a proposed Class of similarly situated persons under Federal Rules of Civil Procedure 23(b)(2), 23(b)(3), and 23(c)(4).

139. Plaintiffs seek to represent the following Nationwide Class ("Class"):

> **<u>The Nationwide Class</u>**
> All natural persons in the United States and its territories who used Defendant's Platform, and whose private information was disclosed or transmitted to Google, New Relic, Mixpanel, or any other Unauthorized Third Party via the Tracking Technologies.

140. Plaintiffs further assert claims on behalf of at least the following subclasses (the Student Subclass, New Jersey Subclass, New Jersey Student Subclass are, together, "Subclasses"):

> **<u>Student Subclass</u>**
> All natural persons who were provided access to Defendant's Platform as part of their publicly funded education, who used Defendant's Platform as part of their publicly funded education, and whose private information was disclosed or transmitted to Google, New Relic, Mixpanel or any other Unauthorized Third Party via the Tracking Technologies.
>
> **<u>New Jersey Subclass</u>**
> All natural persons who used Defendant's Platform while located in New Jersey, and whose private information was disclosed or transmitted to Google, New Relic, Mixpanel or any other Unauthorized Third Party via the Tracking Technologies during the course of such use.
>
> **<u>New Jersey Student Subclass</u>**
> All natural persons who used Defendant's Platform for "K-12 school purposes" as that term is defined in N.J.S.A. 56:8-215 while enrolled in a New Jersey K-12 school, and whose private information was disclosed or transmitted to Google, New Relic, Mixpanel or any other Unauthorized Third Party via the Tracking Technologies.

141. Excluded from the Class and Subclasses are: any claims for wrongful death or property damage; BrainPOP and its parents and subsidiaries; any entity in which BrainPOP holds a controlling interest; BrainPOP's officers, directors, affiliates, legal representatives, heirs,

predecessors, successors, and assigns; anyone employed by counsel in this action; the judge to whom this case is assigned, that judge's spouse and immediate family, and members of that judge's staff.

142. Plaintiffs reserve the right to amend these definitions and to add classes should discovery indicate that the definitions should be narrowed, broadened, or otherwise revised.

143. **Numerosity.** The Class and Subclasses are so numerous that joinder of all members is impracticable. On information and belief, thousands of individuals were affected by BrainPOP's conduct. Their identities are readily ascertainable from BrainPOP's own records and from the records of the third parties whose Tracking Technologies BrainPOP installed.

144. **Commonality.** BrainPOP's conduct gives rise to questions of law and fact common to all Class and Subclasses Members, which predominate over any questions affecting only individuals. These include:

a) whether and to what extent BrainPOP owed a duty to protect the PII of Plaintiffs and Class and Subclass Members;

b) whether BrainPOP owed a duty not to disclose that data to Unauthorized Third Parties;

c) whether BrainPOP violated its own privacy representations by disclosing PII to Unauthorized Third Parties without consent;

d) whether BrainPOP obtained, or could have obtained, consent sufficient to permit the tracking alleged;

e) whether BrainPOP adequately, promptly, and accurately informed Plaintiffs and Class and Subclass Members that their PII would be disclosed to Unauthorized Third Parties;

f) whether BrainPOP violated the law by failing to notify Plaintiffs and Class and Subclasses Members promptly that their PII was being disclosed without consent;

g) whether BrainPOP adequately addressed and corrected the practices that permitted the unauthorized disclosure;

h) whether BrainPOP engaged in unfair, unlawful, or deceptive practices by failing to keep Plaintiffs and Class and Subclass Members' PII free from unauthorized disclosure;

i) whether BrainPOP violated the statutes identified in this Complaint;

j) whether Plaintiffs and Class and Subclass Members are entitled to actual, consequential, statutory, and/or nominal damages;

k) whether BrainPOP knowingly made false representations about its data security and privacy practices;

l) whether BrainPOP knowingly omitted material facts about those practices; and

m) whether Plaintiffs and Current Student Subclass Members are entitled to injunctive relief against the ongoing disclosure of their private data.

145. **Typicality.** Plaintiffs' claims are typical of the Class's and Subclasses. Plaintiffs used Defendant's Platform and had their PII disclosed to third parties without knowledge or written authorization. Every Class and Subclass Member suffered the same injury from the same conduct, and Plaintiffs' claims rest on the same legal theories as theirs.

146. **Adequacy.** Plaintiffs are prepared to take every step necessary to represent the Class fairly and adequately. Their interests align with, and are not antagonistic to, those of Class and Subclass Members. Plaintiffs are represented by counsel experienced in class litigation generally and in digital privacy litigation specifically, who are committed to prosecuting this action

vigorously.

147. **Predominance.** BrainPOP engaged in a common course of conduct toward Plaintiffs and the Class and the Subclass Members: their PII was disclosed to, and used by, Unauthorized Third Parties. The common issues identified above predominate over individualized ones, and resolving them in a single proceeding carries substantial advantages in judicial economy.

148. **Superiority.** A class action is superior to other methods for fairly and efficiently adjudicating this controversy. Class treatment of these common questions is superior to piecemeal individual litigation. Absent a class action, most Class and Subclass Members would find the cost of individual suit prohibitive and would have no effective remedy. Separate actions would also risk inconsistent adjudications and incompatible standards of conduct for BrainPOP. Proceeding as a class presents far fewer management difficulties, conserves judicial and party resources, and protects each Class and Subclass Member's rights.

## VII. CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**VIOLATIONS OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT ("ECPA"), 18 U.S.C. § 2510, *et seq.***
***(On Behalf of Plaintiffs and the Nationwide Class and the Student Subclass)***

149. Plaintiffs repeat and reallege each preceding paragraph as though fully set forth here.

150. The ECPA prohibits, among other things, (1) intentionally intercepting, endeavoring to intercept, or procuring another person to intercept or endeavor to intercept any wire, oral, or electronic communication; and (2) intentionally disclosing, endeavoring to disclose, using, or endeavoring to use the contents of such a communication while knowing or having reason to know that it was obtained through an unlawful interception.

151. The ECPA creates a private right of action for any person whose electronic

communications are intercepted, disclosed, or intentionally used in violation of Chapter 119. 18 U.S.C. § 2520(a).

152. "Electronic communication" means the "transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate . . . commerce." 18 U.S.C. § 2510(12). The PII transmitted between Plaintiffs and Class Members and BrainPOP through Defendant's Platform constitutes electronic communications within that definition. They include, without limitation, communications reflecting students' searches, queries, and FERPA-protected education records.

153. "Contents," as applied to electronic communications, "includes any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8).

154. "Intercept" means the "aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

155. An "electronic, mechanical, or other device" is "any device or apparatus which can be used to intercept a wire, oral, or electronic communication." 18 U.S.C. § 2510(5). The Tracking Technologies, BrainPOP's web servers, and the devices and browsers of Plaintiffs, Class Members, and the Student Subclass Members each constitute such a device.

156. BrainPOP intentionally and knowingly facilitated, and procured third parties to carry out, the interception and use of the contents of these private communications by embedding the Tracking Technologies on Defendant's Platform. BrainPOP controlled every aspect of that arrangement: which pages carried the code, what data the code transmitted, and who received it.

157. BrainPOP disclosed and used, and allowed third parties to use, the contents of these

communications—including students' searches, queries, and the substance of their education records—knowing that the information had been acquired through interception by the code BrainPOP had embedded.

158. That conduct violates at least 18 U.S.C. § 2511(1)(a), § 2511(1)(c), and § 2511(1)(d).

159. The Tracking Technologies are built to transmit a user's actions and communications contemporaneously with each communication and are used in real time to identify and follow individual consumers. The communications at issue were therefore intercepted and used in transit, before reaching their destination.

160. BrainPOP cannot invoke the party exception of 18 U.S.C. § 2511(2)(d). That exception is unavailable where the interception is made "for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State." BrainPOP intercepted these communications for exactly such purposes, including:

a) violations of the Video Privacy Protection Act, 18 U.S.C. § 2710;

b) violations of the New Jersey Student Online Privacy Protection Act, N.J.S.A. 56:8-215 et seq., and unlawful practices under the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1 et seq.;

c) intrusion upon the seclusion of Class and Subclasses Members under the law of New Jersey and other States recognizing that tort; and

e) the confidentiality and privacy standards embodied in FERPA, 20 U.S.C. § 1232g et seq., and COPPA, 15 U.S.C. § 6501 et seq.

161. Independently, BrainPOP used its position as a party to these communications to convey their contents to Google, New Relic, Mixpanel and other Unauthorized Third Parties that

(a) were not participants in the communications, (b) were unknown to Plaintiffs and Class Members as recipients, and (c) received the information without any consent to their unrestricted use of it. Disclosing and monetizing private student communications in this manner is tortious in itself.

162. Plaintiffs and Class and the Student Subclass Members seek all relief available for these violations, including damages, statutory damages, punitive damages in an amount to be determined by a jury, and reasonable attorneys' fees and litigation costs under 18 U.S.C. § 2520.

## SECOND CLAIM FOR RELIEF

**VIOLATIONS OF THE VIDEO PRIVACY PROTECTION ACT, 18 U.S.C. § 2710, *et seq.***
***(On Behalf of Plaintiffs and the Nationwide Class and the Student Subclass)***

163. Plaintiffs repeat and reallege each preceding paragraph as though fully set forth here.

164. The VPPA provides that "a video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider shall be liable to the aggrieved person". 18 U.S.C. § 2710(b)(1).

165. "Personally identifiable information" includes "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider". 18 U.S.C. § 2710(a)(3).

166. A "video tape service provider" is "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials". 18 U.S.C. § 2710(a)(4).

167. BrainPOP is a video tape service provider. Its core business is producing, hosting, and delivering thousands of videos on Defendant's Platform and through other channels, which places it squarely within § 2710(a)(4).

168. Plaintiffs and Class and the Student Subclass Members are "consumers" within 18 U.S.C. § 2710(a)(1). Each registered an account with BrainPOP, exchanged personal information—including a school-issued email address and other identifiers—for access to BrainPOP's goods and services, held an ongoing subscription to those services, and used that subscription to request and watch specific videos.

169. BrainPOP violated the VPPA by knowingly disclosing to Unauthorized third Parties, through the Tracking Technologies, information identifying Plaintiffs and Class and the Student Subclass Members as having requested and watched specific videos—without informed, written consent given in a form distinct and separate from any other legal or financial obligation, as § 2710(b)(2)(B) requires.

170. BrainPOP's disclosures were knowing. BrainPOP selected the Tracking Technologies, configured what they transmitted, chose to include video titles and page URLs identifying particular videos, and paired that content with persistent identifiers supplied by the recipients for the express purpose of identifying individuals.

171. As a result, Plaintiffs, Class Members, and the Student Subclass Members are entitled to all relief available under 18 U.S.C. § 2710(c), including liquidated damages of $2,500 for each Class and Student Subclass Member, punitive damages, reasonable attorneys' fees and costs, and—given Class and Student Subclass Members' continued use of Defendant's Platform—declaratory, equitable, and injunctive relief.

## THIRD CLAIM FOR RELIEF

## VIOLATIONS OF THE NEW JERSEY STUDENT ONLINE PRIVACY PROTECTION ACT, N.J.S.A. 56:8-215 to 56:8-221, AND THE NEW JERSEY CONSUMER FRAUD ACT, N.J.S.A. 56:8-1, *et seq.*

***(On Behalf of Plaintiffs and the New Jersey Student Subclass)***

172. Plaintiffs repeat and reallege each preceding paragraph as though fully set forth

here.

173. BrainPOP is an "operator" of an "online education service" as N.J.S.A. 56:8-215 defines those terms. Defendant's Platform is used primarily for K-12 school purposes and is designed and marketed for K-12 school purposes, and BrainPOP has actual knowledge of both facts.

174. The data BrainPOP disclosed is "covered information" under N.J.S.A. 56:8-215, including persistent unique identifiers, search activity, student identifiers, electronic mail addresses, and information from students' education records.

175. BrainPOP knowingly used covered information to amass profiles about students for purposes other than K-12 school purposes, and enabled Unauthorized Third Parties to do the same, in violation of N.J.S.A. 56:8-216(a)(1).

176. BrainPOP knowingly disclosed covered information to Unauthorized Third Parties in violation of N.J.S.A. 56:8-216(a)(3). No statutory exception applies. In particular, the exception at subsection (a)(3)(f) is unavailable because BrainPOP did not contractually prohibit Google, New Relic, Mixpanel, or any other Unauthorized Third Party from using covered information for purposes beyond providing a contracted service to BrainPOP, did not prohibit them from making further disclosures to subsequent third parties, and did not require them to implement and maintain reasonable security procedures and practices. To the contrary, all recipients use the data for their own independent commercial ends.

177. BrainPOP knowingly engaged in and enabled targeted advertising based on information its service acquired because of its use for K-12 school purposes, in violation of N.J.S.A. 56:8-216(a)(4).

178. BrainPOP failed to implement and maintain reasonable security procedures and

practices appropriate to the nature of the covered information and failed to protect that information from unauthorized use and disclosure, in violation of N.J.S.A. 56:8-217(a) and (b).

179. By operation of N.J.S.A. 56:8-220, each of these violations "shall be an unlawful practice pursuant to P.L.1960, c.39 (C.56:8-1 et seq.)"—that is, a per se unlawful practice under the New Jersey Consumer Fraud Act. Plaintiffs and New Jersey Student Subclass Members need not separately establish that the conduct was deceptive, fraudulent, or intentional; the Legislature has declared it unlawful.

180. Independently of § 56:8-220, BrainPOP committed unlawful practices under N.J.S.A. 56:8-2 through affirmative misrepresentations concerning its handling of student records, and through knowing omissions of material fact—namely, its failure to disclose that identifiable student data and video viewing histories were being transmitted to Unauthorized Third Parties—made with the intent that students, parents, and schools rely upon those omissions.

181. Plaintiffs and New Jersey Student Subclass Members suffered an ascertainable loss of moneys or property as a result. They paid, or had paid on their behalf, subscription fees for a service materially different from and less valuable than the one BrainPOP represented and was legally obligated to provide; they were deprived of the benefit of that bargain; and they lost the market value of, and control over, covered information that carries an established price, as alleged above.

182. A direct causal relationship exists between BrainPOP's unlawful practices and that loss. Had BrainPOP complied with N.J.S.A. 56:8-215 et seq., the covered information would never have left BrainPOP's systems, and Plaintiffs and New Jersey Student Subclass Members would have received the private, compliant educational service for which consideration was paid.

183. Under N.J.S.A. 56:8-19, the Court "shall, in addition to any other appropriate legal

or equitable relief, award threefold the damages sustained by any person in interest," together with "reasonable attorneys' fees, filing fees and reasonable costs of suit." Plaintiffs and New Jersey Student Subclass Members seek that mandatory treble award, fees and costs, and injunctive relief restraining BrainPOP from continuing these practices.

## FOURTH CLAIM FOR RELIEF

### VIOLATIONS OF THE NEW JERSEY WIRETAPPING AND ELECTRONIC SURVEILLANCE CONTROL ACT, N.J.S.A. 2A:156A-1, *et seq.*

***(On Behalf of Plaintiffs and the New Jersey Subclass)***

184. Plaintiffs repeat and reallege each preceding paragraph as though fully set forth here.

185. N.J.S.A. 2A:156A-3 makes it unlawful for any person to purposely intercept, endeavor to intercept, or procure another person to intercept or endeavor to intercept any wire, electronic, or oral communication; to purposely disclose or endeavor to disclose the contents of such a communication knowing or having reason to know it was obtained through interception; or to purposely use or endeavor to use such contents with the same knowledge.

186. N.J.S.A. 2A:156A-2 defines "intercept" as "the aural or other acquisition of the contents of any wire, electronic or oral communication through the use of any electronic, mechanical or other device," and defines "contents" to include "any information concerning the identity of the parties to such communication, or the existence, substance, purport, or meaning of that communication."

187. The communications between Plaintiffs and New Jersey Subclass Members and BrainPOP through Defendant's Platform are electronic communications within N.J.S.A. 2A:156A-2. The Tracking Technologies, BrainPOP's web servers, and the browsers and devices of Subclass Members each constitute an electronic, mechanical, or other device within the statute.

188. By deploying the Tracking Technologies on the login-protected portions of

Defendant's Platform, BrainPOP purposely intercepted, endeavored to intercept, and procured Unauthorized Third Parties to intercept the electronic communications of Plaintiffs and New Jersey Subclass Members, in violation of N.J.S.A. 2A:156A-3(a).

189. By purposely disclosing, or endeavoring to disclose, the contents of those communications to Unauthorized Third Parties while knowing or having reason to know they were obtained through interception, BrainPOP violated N.J.S.A. 2A:156A-3(b).

190. By purposely using, or endeavoring to use, the contents of those communications with the same knowledge, BrainPOP violated N.J.S.A. 2A:156A-3(c).

191. BrainPOP cannot shelter under N.J.S.A. 2A:156A-4(d). That provision exempts a person not acting under color of law who is a party to the communication, or who has the prior consent of a party, only where the communication is not intercepted or used "for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of this State or for the purpose of committing any other injurious act."

192. New Jersey's exception is broader than its federal counterpart. Where 18 U.S.C. § 2511(2)(d) reaches only criminal or tortious purposes, N.J.S.A. 2A:156A-4(d) additionally withdraws the exemption from any interception made "for the purpose of committing any other injurious act." An act need be neither criminal nor tortious to defeat the exemption; it need only be injurious.

193. BrainPOP intercepted and used these communications for purposes that were criminal, tortious, and injurious, including:

a) violations of the New Jersey Student Online Privacy Protection Act, N.J.S.A. 56:8-215 et seq., each of which is a per se unlawful practice under the New Jersey Consumer Fraud Act pursuant to N.J.S.A. 56:8-220;

b) unlawful practices under the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-2;

c) intrusion upon the seclusion of New Jersey Subclass Members, as pleaded in the Fifth Claim for Relief;

d) violations of the Video Privacy Protection Act, 18 U.S.C. § 2710;

e) breach of contract and breach of implied contract; and

f) the injurious act of stripping minor children of control over their identifiable educational records and video viewing histories and delivering that material to advertising and analytics companies for BrainPOP's commercial gain.

194. BrainPOP obtained no consent. Plaintiffs and New Jersey Subclass Members were never told that outside firms would acquire the contents of their sessions, and the minor students among them could not have consented in any event.

195. Under N.J.S.A. 2A:156A-24, Plaintiffs and New Jersey Subclass Members are entitled to recover actual damages, "but not less than liquidated damages computed at the rate of $100.00 a day for each day of violation, or $1,000.00, whichever is higher," together with punitive damages, reasonable attorneys' fees, and other litigation costs reasonably incurred.

## **FIFTH CLAIM FOR RELIEF**

### **INTRUSION UPON SECLUSION**
***(On Behalf of Plaintiffs and the New Jersey Subclass)***

196. Plaintiffs repeat and reallege each preceding paragraph as though fully set forth here.

197. New Jersey recognizes the tort of intrusion upon seclusion as stated in the Restatement (Second) of Torts § 652B: one who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or her private affairs or concerns is subject to liability if the intrusion would be highly offensive to a reasonable person. The intrusion need not be physical,

and the plaintiff need not prove publication.

198. Plaintiffs and New Jersey Subclass Members had a reasonable expectation of privacy in their communications with BrainPOP inside the login-protected student portal—a space reachable only by authenticating, holding their assignments, their coursework, their searches, and the record of what they watched.

199. BrainPOP intentionally intruded upon that seclusion. It configured code to capture what students did inside that protected space and to relay it, contemporaneously, to Unauthorized Third Parties. The intrusion was deliberate in every respect: BrainPOP chose the trackers, chose the pages, and chose what the trackers would send.

200. The intrusion would be highly offensive to a reasonable person. It was directed at children, some of them very young, engaged in compulsory schooling. It reached protected educational records and the intellectual record of what each child chose to watch and search. It was concealed behind invisible code, and it was carried out so that BrainPOP could sell more subscriptions. A reasonable person would be highly offended to learn that the platform delivering her child's public education was routing that child's identifiable academic activity to one of the largest advertising businesses on earth.

201. The offensiveness is compounded by BrainPOP's contrary representations and by the legal duties it owed—under N.J.S.A. 56:8-215 et seq., FERPA, and COPPA—not to do this.

202. As a result, Plaintiffs and New Jersey Subclass Members suffered injury including the invasion of their privacy, mental distress, and the loss of control over their personal information.

203. Plaintiffs and New Jersey Subclass Members are entitled to compensatory and nominal damages, and to punitive damages, BrainPOP having acted willfully and in conscious

disregard of their rights.

## SIXTH CLAIM FOR RELIEF

**NEGLIGENCE AND NEGLIGENCE PER SE**
***(On Behalf of Plaintiffs, the New Jersey Subclass, and the New Jersey Student Subclass)***
***(Pled in the Alternative)***

204. Plaintiffs repeat and reallege each preceding paragraph as though fully set forth here.

205. BrainPOP's conduct appears in every respect to have been intentional. In the alternative, it was at minimum negligent.

206. BrainPOP is an education provider whose students—including Plaintiffs and New Jersey Subclass and New Jersey Student Subclass Members—entrust it with sensitive personal and educational information in the course of using its Platform.

207. In using Defendant's Platform to complete coursework and watch instructional videos, Plaintiffs and New Jersey Subclass and New Jersey Student Subclass Members supplied BrainPOP with private data in the belief that it would be kept confidential. Having collected and stored that data, BrainPOP owed a duty of care to use reasonable means to secure it against unauthorized disclosure.

208. BrainPOP also owed a duty of care arising from the special relationship between an education provider and the children it serves. BrainPOP alone was positioned to ensure that its students' sensitive information—including their education records—was protected from disclosure to third parties such as Unauthorized Third Parties.

209. The New Jersey Student Online Privacy Act, N.J.S.A. 56:8-215 to 56:8-221, is a state statute imposing specific, mandatory duties on operators of online education services: to refrain from using covered information to amass a profile about a student for non-school purposes, to refrain from disclosing covered information to third parties not contractually confined to serving

the operator, to refrain from targeted advertising built on data acquired through school use, and to maintain reasonable security procedures and practices. Plaintiffs and New Jersey Subclass and New Jersey Student Subclass Members are within the class the statute was enacted to protect, and the injury they suffered is precisely the injury it was designed to prevent. BrainPOP's violations of that statute therefore constitute negligence per se. The standards of care embodied in FERPA, 20 U.S.C. § 1232g, the VPPA, 18 U.S.C. § 2710, and COPPA, 15 U.S.C. § 6501 *et seq*., together with prevailing practice in the education-technology sector, further define the duty BrainPOP owed.

210. BrainPOP breached that duty when it disclosed sensitive personal information, education records, and video viewing histories to third parties, without authorization, for those parties' own benefit.

211. BrainPOP breached that duty a second time by failing to disclose to Plaintiffs and New Jersey Subclass and the New Jersey Student Subclass Members that their private information would be used for marketing purposes and transmitted to third parties.

212. It was entirely foreseeable to BrainPOP that unauthorized disclosure of its students' sensitive personal and educational information would injure them.

213. As a direct and proximate result of BrainPOP's negligence, Plaintiffs and New Jersey Subclass and the New Jersey Student Subclass Members were injured as alleged and are entitled to compensatory, punitive, and nominal damages in an amount to be proven at trial.

214. BrainPOP's conduct is ongoing; it continues to disclose Plaintiffs and New Jersey Subclass and the New Jersey Student Subclass Members private data to this day. Plaintiffs and New Jersey Subclass and the New Jersey Student Subclass Members are therefore also entitled to injunctive relief in addition to compensatory, nominal, and punitive damages.

## SEVENTH CLAIM FOR RELIEF

### UNJUST ENRICHMENT
***(On Behalf of Plaintiffs and the Nationwide Class and the Student Subclass)***

215. Plaintiffs repeat and reallege each preceding paragraph as though fully set forth here.

216. Plaintiffs, Class and the Student Subclass Members enriched BrainPOP by supplying it with something of real market worth: their education records and the record of what they watched. BrainPOP took that material, used it, and passed it to Unauthorized Third Parties, converting it into advertising reach, analytical insight, and marketing capability for itself.

217. BrainPOP knew and appreciated the value of the information it deliberately collected and disclosed, as demonstrated by the analytics, insights, and advertising capability it obtained in return—including the ability to identify "lookalikes" convertible from prospects into paying students.

218. Plaintiffs and Class Members, and the Student Subclass Members conferred a further benefit on BrainPOP in the form of subscription fees and other consideration paid to BrainPOP, directly or on their behalf.

219. Plaintiffs Class Members, and the Student Subclass Members would not have supplied their private and educational information to BrainPOP, and would not have paid for BrainPOP's services, had they known BrainPOP was disclosing that data to third parties and exploiting it commercially.

220. BrainPOP unjustly retained these benefits at their expense, providing no commensurate compensation in exchange for disclosing their private information for its own profit. Equity and good conscience do not permit BrainPOP to keep them.

221. BrainPOP should be compelled to disgorge into a common fund, for the benefit of

Plaintiffs and Class Members, all unlawful and inequitable proceeds it received from them, together with such other relief as the Court deems just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the Class and Subclasses, respectfully request judgment against BrainPOP as follows:

A. certifying the Nationwide Class, the Student Subclass, the New Jersey Subclass, and the New Jersey Student Subclass, and appointing Plaintiffs as class representatives and their counsel as class counsel;

B. enjoining BrainPOP from continuing the wrongful conduct alleged, including the misuse and disclosure of the sensitive information of Plaintiffs and Student Subclass Members;

C. awarding such further injunctive and equitable relief as is necessary to protect the interests of Plaintiffs and Student Subclass Members;

D. awarding all damages available at law or in equity, including actual, consequential, punitive, statutory, and nominal damages, in an amount to be determined;

E. awarding attorneys' fees, costs, and litigation expenses as allowed by law;

F. awarding pre- and post-judgment interest on all amounts awarded; and

G. granting such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all claims so triable.

Dated: November 13, 2026

Respectfully submitted,

By: <u>*/s/ Kimberly M. Donaldson-Smith*</u>
Kimberly M. Donaldson-Smith
Beena M. McDonald
**CHIMICLES SCHWARTZ KRINER & DONALDSON-SMITH LLP**
One Haverford Centre
361 West Lancaster Avenue
Haverford, PA 19041
P: (610) 642-8500
F: (610) 649-3633
*kmd@chimicles.com*
*bmm@chimicles.com*

Edwin J. Kilpela, Jr.
Paige T. Noah
**WADE KILPELA SLADE, LLP**
6425 Living Place, Suite 200
Pittsburgh, PA 15206
Phone: (412) 314-0515
*ek@waykayslay.com*
*pnoah@waykayslay.com*

David Slade*
**WADE KILPELA SLADE, LLP**
1 Riverfront Pl., Suite 745
N. Little Rock, AR 72114
*slade@waykayslay.com*

Lori G. Feldman*
Tiffany Wong*
Justin Alvarez-Herman*
**HECHT PARTNERS LLP**
125 Park Avenue, 25th Floor
New York, NY 10017
888.421.4529
*lfeldman@hechtpartners.com*
*twong@hechtpartners.com*
*jalvarezherman@hechtpartners.com*

Counsel for Plaintiff and the Proposed Class

* *pro hac vice forthcoming*